IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–02427–EWN


MAGDALENA ARCHULETA,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

      Defendant.

---

### ORDER AND MEMORANDUM OF DECISION

---

This is a social security benefits appeal.  Plaintiff Magdalena Archuleta challenges the final decision of the Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits.  Jurisdiction is premised upon 42 U.S.C. § 405(g) (2006).

### FACTS

*1.*    *Medical Evidence*

Plaintiff was born on May 13, 1971 and was twenty-nine years old at the onset of her alleged disability.  (Admin. R. at 64 [filed Mar. 10, 2006] [hereinafter "Admin. R."].)  Plaintiff graduated from high school, completed approximately one year of college, and obtained specialized training as a certified nursing assistant ("CNA").  (*Id.* at 88, 240.)  Plaintiff has worked in the vocationally relevant past as a CNA, telemarketer, office helper, receptionist,

customer service representative, waitress, and personal care provider.  (*Id*. at 83.)  Plaintiff alleges

that she became unable to work beginning on August 1, 2000, due to: (1) neck pain; (2)

dislocated vertebrae and pinched nerves in her neck and back; (3) ankle problems; (4) migraine

headaches; (5) blurred vision; and (6) memory loss.  (*Id*. at 82.)

On September 1, 2001, Jose Barrera, M.D. performed a consultative examination on

Plaintiff.  (*Id*. at 131–36.)  Plaintiff complained to Dr. Barrera of neck and ankle pain.  (*Id*. at

131.)  X-rays of Plaintiff's cervical spine and right shoulder were "unremarkable."  (*Id*. at

134–35.)  X-rays of Plaintiff's ankle were "unremarkable," except for evidence of a small previous

fracture off the medial ankle.  (*Id*. at 136.)   Plaintiff explained that on New Year's Eve several

years prior, she was thrown down a flight of stairs and sustained a broken ankle.[1]  (*Id*. at 131.)

Dr. Barrera opined that Plaintiff could: (1) stand and walk for six hours with normal breaks; (2)

sit for six hours with normal breaks; (3) lift and carry fifty pounds occasionally and twenty-five

pounds frequently.  (*Id*. at 133.)  Further, Dr. Barrera opined that Plaintiff: (1) had no

manipulative, visual, communicative, or workplace environmental limitations; and (2) did not use

an assistive device.  (*Id.*)

On February 21, 2002, in order to establish a primary care physician relationship, Plaintiff

presented to the Southern Colorado Medicine clinic and visited physician's assistant Yuri

---

[1]Throughout the record, Plaintiff's recollection of the date of this event varies, but the
medical evidence reflects that Plaintiff sought treatment in connection with this incident on
January 1, 2006.  (Admin. R. at 190–91.)  Further, Plaintiff's recollection of who it was who
pushed her down the stairs varies between an ex-boyfriend and her step-brother.  (*Id.* at 82, 131,
157, 159, 173, 204, 256.)

Rothbaum.  (*Id.* at 159–60.)  Plaintiff complained to Mr. Rothbaum that she suffered from a chronic neck disorder and right ankle pain due to her prior New Year's Eve fall down the stairs. (*Id.* at 159.)  Additionally, Plaintiff stated that she experienced headaches that were "constant in nature and somewhat infrequent."  (*Id.*)  Plaintiff stated she had used marijuana in the past to alleviate her neck pain, but was not currently using the drug.  (*Id.*)  Plaintiff stated that she occasionally drank alcohol, but not to intoxication.  (*Id.*)  Mr. Rothbaum found that Plaintiff had "obvious muscle spasm and trigger points" and suggested she: (1) would obtain pain relief from muscle relaxants; (2) should begin regularly performing neck stretches and using a hot pack; (3) would likely receive benefits from "aggressive physical therapy or some type of yoga classes." (*Id.* at 160.)  On March 6, 2002, Plaintiff "request[ed] a note from [Mr.] Rothbaum [] stating she was unable to work due to her injuries" and became "extremely angry" when her request was denied.  (*Id.* at 158.)

On March 22, 2002, Plaintiff returned to the Southern Colorado Medicine clinic and visited Daniel Wik, M.D.  (*Id.* at 156–57.)  Plaintiff complained to Dr. Wik of "intermittent exacerbations/remissions" of neck pain and headaches that interfered with her ability to concentrate.  (*Id.* at 157.)  Plaintiff stated that twice a day, for about three hours at a time, she experienced pain that worsened with stress, lifting, and activity and improved with rest and medication.  (*Id.*)  Dr. Wik advised Plaintiff to perform stretching exercises for her neck and prescribed her pain and anti-depressant medications.  (*Id.* at 156.)

On April 4, 2002, Maria Rodriguez, Ph.D. completed a county social services form, in which she opined that Plaintiff suffered from major depression, post-traumatic stress disorder

("PTSD"), agoraphobia, and anxiety.[2]  (*Id.* at 138.)  Additionally, Dr. Rodriguez indicated that

she expected Plaintiff's impairments to last for one year or more and Plaintiff was "entering into

therapy." (*Id.*)  On June 19, 2002, Plaintiff presented to Dr. Wik with "extreme amounts of

anxiety" and "extreme urgency in having [Dr. Wik] fill out a disability or incapacity evaluation for

up to [one] year at a time, due to agoraphobia, anxiety, and depression."  (*Id.* at 154.)  Dr. Wik:

(1) prescribed Plaintiff anti-anxiety medications; (2) recommended that Plaintiff continue to

receive mental health therapy; and (3) completed a disability form stating that Plaintiff was unable

to work for ninety days.  (*Id.* at 153–54.)

On June 26, 2002, July 24, 2002, August 26, 2002, September 9, 2002, October 9, 2002,

and January 22, 2003, Plaintiff presented to the Parkview Medical Center, where physician's

assistant Mark Farmer treated Plaintiff, evidently under the supervision of Steve Martin, M.D.

(*Id.* at 142–43, 144–45, 195–96, 198–203.)  Progress notes indicate that on each of those dates,

Mr. Farmer changed Plaintiff's medications and recommended that she continue receiving

therapy.  (*Id.* at 142–43, 145, 195, 199.)

On June 26, 2002, Plaintiff underwent a mental health examination performed by Carlos

Rodriguez, Ph.D. for the Colorado Department of Human Services in connection with her

application for state governmental assistance.  (*Id.* at 139–40.)  Dr. Rodriguez diagnosed Plaintiff

---

[2]PTSD is "a syndrome occurring after a person experiences trauma outside the range of normal human experience."  4–P J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE 8552 (Matthew Bender 2005).  PTSD symptoms include flashbacks, nightmares, severe stress with numbness to stimuli resembling the trauma, anxiety, and depression.  *Id.*  Agoraphobia is the condition of having an irrational fear of being in a public place or a large open space.  1–A J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE 3774 (Matthew Bender 2005).

with PTSD, major depression, alcohol and cocaine abuse, and continuing marijuana abuse.  (*Id.* at 139.)  Dr. Rodriguez opined that Plaintiff had no capacity to work for at least one year, but could be employable if she: (1) continued receiving mental health therapy; (2) followed her prescribed medication regime; and (3) underwent alcohol and substance abuse treatment.  (*Id.* at 140.)

On July 4, 2002, Plaintiff sought emergency medical treatment and admission at St. Mary Corwin Medical Center "because of increased depression."  (*Id.* at 166–87.)  Plaintiff complained of PTSD, depression, hearing voices, "poor sleep, decreased interest, increased guilt, low energy, poor concentration, and poor appetite."  (*Id.* at 173.)  Plaintiff admitted that she had not been compliant with her medication regime.  (*Id.* at 171, 173.)  Attending physician Robert Tonsing, M.D. performed a psychiatric assessment and diagnosed Plaintiff with major depression, chronic neck pain with muscle spasms, and post-traumatic headaches.  (*Id.* at 175.)  Dr. Tonsing found Plaintiff to have a Global Assessment Functioning ("GAF") score of fifty, and opined that her GAF score over the prior year was sixty.[3]  (*Id.* at 173–75.)  On July 5, 2002, John Gehred, M.D. performed a consultative examination on Plaintiff.  (*Id.* at 177–80.)  Plaintiff reported to Dr. Gehred that she: (1) had used marijuana in the past; and (2) had used cocaine at least once a week

---

[3]The GAF scale is a tool for rating an individual's social, occupational, and psychological functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., Text Revision, 2000).  A GAF score between forty and fifty indicates: (1) serious symptoms, such as suicidal ideation or severe obsessional rituals; or (2) a serious impairment in social, occupational, or school functioning, such as an inability to keep a job or a lack of friends.  *Id.*  A GAF score between fifty and sixty indicates: (1) moderate symptoms, such as flat affect and circumstantial speech or occasional panic attacks; or (2) moderate difficulty in social, occupational, or school functioning, such as maintaining few friends or involvement in conflicts with peers or coworkers.  *Id.*

until early June 2002.  (*Id.* at 177.)  Dr. Gehred noted that: (1) Plaintiff had never filled several of her prescriptions; and (2) he did not believe she had been taking the anti-depressants Dr. Wik prescribed her.  (*Id.* at 178.)  On July 7, 2002, Plaintiff requested discharge from the hospital, stating that she had an appointment the following day and needed to enroll her son in summer school.  (*Id.* at 166.)  On the same date, Plaintiff was discharged — "against medical advice" — and assessed with a GAF score of fifty-eight.  (*Id.* at 168.)

On February 20, 2003, Plaintiff visited David R. Benson, Ph.D. and underwent a mental status examination.  (*Id.* at 204–06.)  Dr. Benson diagnosed Plaintiff with PTSD, depression, and substance abuse problems that were reportedly in remission.  (*Id.* at 206.)  Dr. Benson opined that Plaintiff: (1) should receive mental health treatment for the foreseeable future; and (2) might benefit from vocational training if she became stabilized.  (*Id.* at 206.)  Dr. Benson completed a form regarding Plaintiff's ability to perform work-related activities, in which he opined further that Plaintiff had: (1) slight limitations in her abilities to make simple work decisions and understand, remember, and carry out short, simple instructions; (2) moderate limitations in her abilities to understand, remember, and carry out detailed instructions; (3) moderate limitations in her abilities to interact with the public, co-workers, and supervisors; (4) moderate difficulties in her ability to respond to changes at work; and (5) marked difficulties in her ability to respond to workplace pressures.  (*Id.* at 207–08.)

On July 9, 2003, Dr. Maria Rodriguez authored a progress report pertaining to the period of time between October 2002 and July 2003.  (*Id.* at 209–10.)  Dr. Rodriguez noted that Plaintiff had maintained contact with her through "crisis calls and occasional face-to-face sessions."  (*Id.* at

209.)  Dr. Rodriguez opined that Plaintiff's "emotional chronic instability le[ft] her chronically

unable to succeed at gainful employment."  (*Id.*)

## 2.   *Procedural History*

On June 15, 2001, Plaintiff filed an application for disability insurance benefits.  (*Id.* at

64–66.)  On September 17, 2001, the Social Security Administration denied Plaintiff's

application.  (*Id.* at 230–34.)  On October 1, 2001, Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.* at 35–36.)  On July 10, 2003, the ALJ held a hearing, at

which Plaintiff and a vocational expert ("VE") testified.[4]  (*Id.* at 236–63.)

Plaintiff testified that she had two children and had never been married.  (*Id.* at 244–45.)

Plaintiff explained that her children did not live with her, and she "basically" lived alone.  (*Id.* at

245.)  Plaintiff testified that she was able to drive a car, but tried not to do so often, because she

did not have a driver's license.  (*Id.* at 248.)  Plaintiff stated that: (1) her mother generally

performed Plaintiff's housework; (2) she did not cook for herself and generally either ate "cold

food, cold cuts," and "fast food" or "munch[ed]" at her parents' house; and (3) she tended to

"sleep most of the day" or "all day" — although she also testified that she did not sleep during the

day.  (*Id.* at 245, 247, 254.)

Plaintiff testified that she was depressed, had problems concentrating, and had suicidal

thoughts "pretty often" and "sometimes daily."  (*Id.* at 248–49.)  Plaintiff testified that she had

---

[4]From the record, it appears that the two-year delay between Plaintiff's request for a
hearing and the hearing itself is due in part to: (1) a continuation of at least one hearing in order
for Plaintiff to undergo a consultative examination; and (2) Plaintiff's arrest for harassment.
(Admin. R. at 197, 246.)

trouble: (1) completing tasks; (2) remembering important dates and appointments; and (3) remembering where she put her belongings, such as her driver's license and keys.[5]  (*Id.* at 252–53.)  Plaintiff stated she experienced severe mood swings and had "an anger issue."  (*Id.* at 253–54.)  Plaintiff testified that "financial things or just simple things" made her "panic and stress out."  (*Id.*)  Plaintiff explained that she experienced panic and anxiety attacks every day, which caused her to lose her breath, get nervous, and shake.  (*Id.* at 257–58.)

As to her physical symptoms, Plaintiff stated that she suffered from migraines brought on by stress "every day," lasting approximately "three to four hours," but did not take medications for them.  (*Id.* at 251–52.)  Plaintiff testified that she experienced "extreme" and "chronic pain" in her neck every day, and her neck pain intensified when she experienced headaches.  (*Id.* at 255–56.)  Plaintiff stated that she experienced neck muscle spasms on a monthly basis and had "a problem with [her] right ankle."  (*Id.* at 256.)

The VE testified at the hearing regarding her review of the vocational exhibits in Plaintiff's file.  (*Id.* at 259–63.)  The VE explained that Plaintiff's past work as: (1) a CNA was a medium occupation with a specific vocational preparation ("SVP") level four; (2) a telemarketer was a sedentary occupation with an SVP level three; (3) an office helper was a light occupation with an SVP level two; (4) a customer service representative was a sedentary occupation with an SVP level four; (5) a personal care provider was a medium occupation with an SVP level three; (6) a

---

[5]Plaintiff's testimony seems quite odd when considered in conjunction with her statement that she did not have a driver's license.  (Admin. R. at 248.)

receptionist was a sedentary occupation with an SVP level four; and (7) a waitress was a light occupation with an SVP level three.[6]  (*Id.* at 260.)

Additionally, the VE opined on a series of hypothetical questions posed by the ALJ.  (*Id.* at 261–62.)  The VE testified that an individual similarly situated to Plaintiff in age and education, limited to: (1) performing a full range of medium occupations with an SVP level two or lower, requiring only "simple, rote, repetitive type work;" (2) no dealing with the general public; (3) occasional dealing with co-workers; and (4) no hourly quotas, would be able to perform either Plaintiff's prior work as an office helper or work as a laundry worker, machine operator, or photocopy machine operator.  (*Id.* at 261.)  The VE opined that an individual subject to the same limitations outlined above with the additional limitation of regularly needing to be isolated on an unpredictable basis due to symptoms from pain or depression could not perform any work.  (*Id.* at 262.)

On August 8, 2003, the ALJ issued a decision reflecting his findings that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id.* at 15–27.)  In reaching his conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since August 1, 2000.  (*Id.* at 19.)  The ALJ next determined that Plaintiff's headaches, shoulder pain, and ankle pain did not cause ongoing or significant functional limitations and thus were not severe impairments.  (*Id.* at 20.)  The ALJ opined that Plaintiff's PTSD, strained cervical spine, and

---

[6]SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) (citation and internal quotation marks omitted).

affective disorder were severe impairments.  (*Id.*)  Despite their severity, the ALJ determined that these three impairments were not sufficiently severe to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations Number 4, because Plaintiff failed to establish "the necessary clinical, laboratory, and/or radiographic findings."  (*Id.*)  Additionally, the ALJ found that although Plaintiff's testimony was "forthright and sincere," he did "not consider[] [it] to be fully credible."  (*Id.* at 22.)

Based on the evidence presented, the ALJ concluded that Plaintiff had the RFC "to perform medium work with no complex tasks" and "no dealing with the general public; occasional dealing with coworkers; and no hourly quotas."  (*Id.* at 24.)  In accord with this RFC, the ALJ determined that Plaintiff could perform work as a photocopy machine operator, laundry worker, or machine operator, and therefore was not disabled.  (*Id.* at 25.)

On September 27, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making it the final administrative decision for the purposes of judicial review.  (*Id.* at 7–9.)  On November 30, 2005 Plaintiff filed a timely complaint in this court challenging the Commissioner's denial of disability benefits.  (Compl. [filed Nov. 30, 2005].)  On May 10, 2006, Plaintiff filed her opening brief.  (Pl.'s Opening Br. [filed May 10, 2006] [hereinafter "Pl.'s Br."].)  On June 19, 2006, Defendant filed a response.  (Def.'s Resp. Br. [filed June 19, 2006] [hereinafter "Def.'s Resp."].)  On July 6, 2006, Plaintiff filed a reply.  (Pl.'s Reply Br. [filed July 6, 2006] [hereinafter "Pl.'s Reply"].)

## ANALYSIS

### 1.    Standard of Review

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part, that:

> [t]he findings of the Commissioner of Social Security as to any fact,
> if supported by substantial evidence, shall be conclusive, and where
> a claim has been denied by the Commissioner of Social Security or
> a decision is rendered under subsection (b) of this section which is
> adverse to an individual who was a party to the hearing before the
> Commissioner of Social Security, because of failure of the claimant
> or such individual to submit proof in conformity with any regulation
> prescribed under subsection (a) of this section, the court shall
> review only the question of conformity with such regulations and
> the validity of such regulations.

42 U.S.C. § 405(g) (2006).  Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision.  *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The

court must uphold the Commissioner's decision if it is supported by substantial evidence.  *See*

*Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This court cannot reweigh the evidence

nor substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316

(10th Cir. 1987).  That does not mean, however, that my review is merely cursory.  To find that

the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant

evidence that a reasonable person might deem adequate to support the ultimate conclusion.  *Frey*

*v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

**2.     *Evaluation of Disability***

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving disability, a claimant must make a *prima facie* showing that she is unable to return to the prior work she has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2006); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled

or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2006); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2006). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d) (2006). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform his previous work, she is not disabled. 20 C.F.R. § 404.1520(e) (2006); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f) (2006); *Williams*, 844 F.2d at 751.

**3.      *Disability Determination***

Plaintiff sets forth five arguments in support of her contention that the ALJ's decision is erroneous. Plaintiff argues the ALJ erred in: (1) evaluating Dr. Maria Rodriguez's opinion; (2) failing to discuss Mr. Farmer's and Dr. Martin's opinions; (3) evaluating Dr. Carlos Rodriguez's opinion; (4) failing to develop the record with respect to Dr. Carlos Rodriguez's opinion; and (5) omitting certain non-exertional limitations from Plaintiff's RFC. (Pl.'s Br. at 5–8.) Plaintiff

-13-

essentially argues that the ALJ erred in considering and weighing her treating source's medical opinions and in assessing her RFC.  Accordingly, in the interest of clarity and conciseness, I combine and re-order Plaintiff's overlapping arguments in my discussion below.

   ***a.   The ALJ's Evaluations of Expert Medical Opinions***

   Plaintiff argues the ALJ incorrectly valued the medical opinions of Dr. Martin, Mr. Farmer, and the Drs. Rodriguez.  I discuss each opinion and Plaintiff's arguments in connection therewith in turn.

     ***i.   Mr. Farmer's and Dr. Martin's Opinions***

   The ALJ did not specifically mention Mr. Farmer's or Dr. Martin's opinions in his decision.  (Admin. R. at 18–27.)  Plaintiff argues that this omission was in error, because the ALJ was obligated to discuss the opinions.  (Pl.'s Br. at 16–18.)  Plaintiff's argument is disingenuous.  All of the opinions she alleges the ALJ overlooked are signed only by Mr. Farmer.  (Admin. R. at 142–45, 195–96, 199, 202.)  Without so much as a signature or other demarcation of his name on the documents, it is quite difficult to ascertain how these opinions and notes could be attributed to Dr. Martin — and Plaintiff makes no argument to elucidate the point.  (*Id.*; *see* Pl.'s Br. at 16–18.)  Given that Mr. Farmer is a physician's assistant, he is considered an "other source."  20 C.F.R. § 404.1513(d)(1) (2006).  Unlike evidence from "acceptable medical sources" such as licensed physicians, which an ALJ "needs" in order to determine whether a claimant is under a disability, an ALJ "may use" the opinions of an "other source" in making such a determination.  *Id.* §§ 404.1513(a), (d)(1).  Accordingly, in the instant case, the ALJ *could* use Mr. Farmer's medical opinion to assist "in determining the severity of [Plaintiff's] impairments and how they

affect[ed] her ability to work . . ., but [the] opinion [would] not carry the same weight as the medical opinion of a licensed physician." *Shubargo v. Barnhart*, 161 F. App'x 748, 751–52 (10th Cir. 2005).

As to the opinion itself, Plaintiff appears to assert that the ALJ erred in failing to discuss Mr. Farmer's prescription of medications and diagnosis that she had depression, PTSD, a history of psychosis, "borderline" intelligence, and a GAF score of forty. (Pl.'s Br. at 17.)  Significantly, an ALJ must consider all of the record evidence, but need not discuss it all. *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996).  Given the ALJ's: (1) finding that Plaintiff suffered from PTSD and depression; (2) general discussion of Plaintiff's medications and non-compliance with her prescriptions; (3) recognition that Plaintiff had been receiving "regular mental health counseling since at least February 2002;" (4) discussion concerning Plaintiff's hospitalization in July 2002; and (5) express statement that he "considered all of the documents identified in the record as exhibits," I find no error in the ALJ's failure to discuss the specifics of Mr. Farmer's medical opinions and notes. (Admin. R. at 18, 19–20, 22.)

### ii.    *Dr. Carlos Rodriguez's Opinion*

Dr. Carlos Rodriguez opined that Plaintiff could not work for at least one year and diagnosed her with PTSD, depression, alcohol abuse, cocaine abuse, and continuing marijuana abuse. (*Id.* at 139–40.)  The ALJ afforded Dr. Rodriguez's opinion "no weight," because it was "based only on [Plaintiff's] mental condition with ongoing marijuana use" and "not compatible with [Plaintiff's] testimony and the entire record." (*Id.* at 23.)  Plaintiff argues that the ALJ erred

by failing to: (1) discuss requisite factors in evaluating the opinion; and (2) develop the record with respect to Plaintiff's drug abuse as mentioned in the opinion.  (Pl.'s Br. at 18–21.)

At the outset, I note that as a one-time examining physician, Dr. Rodriguez is a nontreating source.  *See* 20 C.F.R. § 404.1502 (2006) ("Nontreating source means a physician . . . who has examined you but does not have, or did not have, an ongoing relationship with you."). "[F]indings of a nontreating physician based upon limited contact and examination are of suspect reliability."  *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987).  Still, in assessing the weight a nontreating source's opinion deserves, an ALJ is required to consider several factors, and to provide specific, legitimate reasons for rejecting it.  *Siegle v. Barnhart*, 377 F. Supp. 2d 932, 940 (D. Colo. 2005) (citing *Doyal v. Barnhart*, 331 F.3d 758, 764 [10th Cir. 2003]) (other citations omitted).  The requisite factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003); *see* 20 C.F.R. §§ 404.1527, 416.927 (2006).  Here, Plaintiff argues briefly that the ALJ erred in his analysis because he failed to consider the kind of examination Dr. Rodriguez performed, the degree to which the opinion is supported by relevant evidence, and whether Dr. Rodriguez is a specialist in his field, as required by factors two, three, and five listed above.  (Pl.'s Br. at 12.)  I disagree.

-16-

I find no legal support for Plaintiff's implicit argument that an ALJ must *discuss* all of the factors, and Plaintiff provides none. (*Id.*, *passim*.) Contrary to Plaintiff's argument, "an ALJ is not required to discuss every piece of evidence." *Clifton*, 79 F.3d at 1009–10. Rather, upon consideration of the factors listed above, an ALJ must merely state "good reasons" for the weight he ultimately assigns an opinion. *Watkins*, 350 F.3d at 1301. "Finally, if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." *Id.* Thus, inconsistency of an opinion with the record as a whole is a proper basis upon which to rely in rejecting an opinion. *Id.*

In the instant case, inconsistencies are readily apparent. On June 26, 2002, Dr. Rodriguez expressly diagnosed Plaintiff with alcohol and cocaine abuse problems and an ongoing marijuana abuse problem. (Admin. R. at 139.) However, on February 21, 2002 and July 4, 2002, Plaintiff reported that she had used marijuana in the past, but did not use it currently, and drank alcohol occasionally, but not to intoxication.[7] (*Id.* at 159, 177.) At the hearing before the ALJ in 2003, Plaintiff testified that she did not use any illegal drugs and was "starting" to have a drinking problem, because she drank once a week. (*Id.* at 258–59.) None of Plaintiff's other physicians diagnosed her with ongoing substance abuse problems. (*Id.*, *passim*.) In light of this clear inconsistency, I find the ALJ did not err in rejecting Dr. Carlos Rodriguez's opinion.

Finally, Plaintiff argues that the ALJ erred by failing to re-contact Dr. Rodriguez and obtain additional information concerning the effects of her substance abuse problems on her

---

[7]On July 4, 2002, Plaintiff also reported that she had used cocaine weekly until "the earlier part of June 2002." (Admin. R. at 177.)

disability. (Pl.'s Br. at 20.)   When an individual is found disabled and there is medical evidence showing that the individual is addicted to drugs or alcohol, the ALJ must determine whether the addiction is a contributing factor to the individual's disability. 20 C.F.R. § 404.1535 (2006). Plaintiff argues that the ALJ erred in failing to: (1) perform this analysis; and (2) obtain additional information in order to perform the analysis. (Pl.'s Br. at 20–21.) Plaintiff's argument is sophomoric and unconvincing. By its own terms, the requirement Plaintiff cites is only applicable where the Commissioner finds that an individual is "disabled and [has] medical evidence of [] drug addiction or alcoholism." 20 C.F.R. § 404.1535 (2006). Here, Plaintiff was found not to be disabled. (Admin. R. at 7–9, 18–27, 30–34.) Further, Plaintiff herself did not claim that alcoholism or drug addiction was either a limiting factor or a contributing factor to her alleged disability. (*Id.* at 82.) Consequently, the ALJ did not err in failing to analyze the effects of Plaintiff's drug abuse or alcoholism on her alleged disability.

### iii.    Dr. Maria Rodriguez's Opinion

The ALJ accepted Dr. Maria Rodriguez's assessment that Plaintiff had "some mental limitations which would affect her ability to perform some jobs," but, "based on the record as a whole," accorded her opinion little weight and rejected her conclusion that Plaintiff could not work. (*Id.* at 23.) Plaintiff argues that the ALJ erred in evaluating the opinion because he failed to: (1) provide good reasons for the weight afforded; (2) discuss the requisite factors in determining how much weight to afford the opinion; and (3) support his evaluation with substantial evidence. (Pl.'s Br. at 12–16.) I need only discuss the first point.

The reasons an ALJ gives for the weight assigned to a treating physician's opinion must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (citation and internal quotation marks omitted).   In the instant case, although it is clear that the ALJ gave Dr. Rodriguez's opinion little weight and accepted only some of her conclusions, the reason for this weight is not at all clear.   Indeed, the ALJ merely summarizes Dr. Rodriguez's findings and states the weight he accords them, "based on the record as a whole."  (Admin. R. at 23.)  This sweeping rationale simply cannot suffice to support the ALJ's evaluation.   Accordingly, the ALJ is instructed to give meaningful reasons for whatever weight he or she assigns to Dr. Maria Rodriguez's opinion on remand.

### b.      The ALJ's Assessment of Plaintiff's RFC

The ALJ determined that Plaintiff had the RFC "to perform medium work with no complex tasks (SVP [level two] or less); [with] no dealing with the general public; occasional dealing with coworkers; and no hourly quotas."[8]  (*Id.* at 24.)  Plaintiff argues that the ALJ erred in making this RFC assessment because he failed to include certain of her non-exertional limits. (Pl.'s Br. at 21–27.)  More specifically, Plaintiff argues it was error to omit from her RFC the moderate limitations on her abilities to understand and carry out detailed instructions that Dr.

---

[8]Work with an SVP level two is considered unskilled work, requiring "little or no judgment to do simple duties that can be learned on the job in a short period of time." *Chavez v. Barnhart*, 126 F. App'x. 434, 436 (10th Cir. 2005).

Benson found she had.  (*Id.* at 22.)  In essence, Plaintiff argues that the ALJ erred by failing to adopt Dr. Benson's opinion in its entirety.  I disagree.

First, an ALJ must *consider* the medical evidence in assessing a claimant's RFC, but I find no support in either case law or logic for Plaintiff's contention that an ALJ must *accept* all medical evidence in making such an assessment.  *See Wyatt v. Barnhart*, 190 F. App'x 730, 734 (10th Cir. 2006) (holding an ALJ must consider the medical evidence on record in assessing RFC).  Indeed, Plaintiff provides neither argument nor legal precedent to support her position.  (Pl.'s Br.; Pl.'s Reply.)  In short, this court cannot do what Plaintiff implicitly asks.  This court cannot re-weigh the evidence or substitute its judgment for that of the ALJ in order to impose the limitations Plaintiff seeks.  *Jordan*, 835 F.2d at 1316.  The ALJ chose to accord Dr. Benson's opinion "significant weight," due in part to its consistency with the record.  (Admin. R. at 23.)  The ALJ did not purport to accept the opinion in its entirety and gave a specific, meaningful reason for the deference given.  (*Id.*)  Plaintiff herself does not argue that the ALJ erred in according Dr. Benson's opinion the weight he did.  (*See* Pl.'s Br. at 5–8.)

Moreover, determination of an RFC "is an administrative assessment, based upon all the evidence of how the claimant's impairments and related symptoms affect her ability to perform work-related activities."  *Young v. Barnhart*, 146 F. App'x 952, 955 (10th Cir. 2005) (citing Soc. Sec. Ruling 96–5p, 1996 WL 374183, at *2, *5).  "The final responsibility for determining RFC rests with the Commissioner, based upon all the evidence in the record, not only the relevant medical evidence."  *Id.* (citing 20 C.F.R. §§ 404.1527[e][2], 404.1545[a][3], 404.1546[c]).  Plaintiff does not argue that the ALJ failed to consider all the evidence on the record in making his

-20-

assessment.  (Pl.'s Br.; Pl.'s Reply.)  As previously noted, the ALJ expressly stated in his opinion that he had "carefully considered all of the documents identified in the record as exhibits, the testimony at the hearing, and the arguments presented."  (Admin. R. at 18.)  Given that the ALJ considered all of the evidence — including the medical evidence in the form of Dr. Benson's opinion — in arriving at the RFC, Plaintiff's argument that the ALJ committed "legal error" in making his determination simply does not obtain.  Still, I cannot say that the ALJ's RFC assessment necessarily must stand.  The RFC assessment is inextricably entangled with the ALJ's evaluation of and weight accorded to Dr. Maria Rodriguez's opinion.

**4.**      *Conclusion*

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED in part and REVERSED and REMANDED in part for proceedings consistent with this opinion.

Dated this 25th day of January, 2007.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge